UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                          1:19-CR-155(MAD)

ALBERT HESSBERG, III,

                Defendant.

**SENTENCING MEMORANDUM**

Dated: October 21, 2019

                E. STEWART JONES HACKER MURPHY, LLP

                By: _____
                E. Stewart Jones, Jr., Esq.
                *Attorneys for Defendant*
                Office & P.O. Address
                28 Second Street
                Troy, New York 12180
                Telephone: (518) 274-5820

1

# APPLICATION OF THE PARSIMONY PRINCIPLE GOVERNING ALL FEDERAL SENTENCING DECISIONS "SUFFICIENT BUT NOT GREATER THAN NECESSARY" FULLY SUPPORTS A DOWNWARD VARIANCE FROM THE GUIDELINES

As the Supreme Court has explained:

> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensure," *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011) (Sotomayor, J.) (internal quotation omitted); *see id.* ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender.") (internal quotation omitted).

The *Pepper* Court affirmed the very principle that had been announced 15 years earlier by that Court in *Koon v. United States*:

> "Consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue" (*Koon v. United States*, 518 U.S.81, 113 (1996)).

Clearly, *Koon* in its language forecasts the eventual decision to render the guidelines as merely advisory and both *Pepper* and *Koon* give voice to the "parsimony principle" that instructs Sentencing Courts to recognize the uniqueness of each offender and offense and to impose in each individual case a sentence that is, for that case, "sufficient but not greater than necessary." The Second Circuit, consistent with the Supreme Court's language cited above, has emphasized that the sentencing judgment is required to "consider all of the 18 U.S.C. §3553(a) factors and then undertake an individualized assessment" based upon the specific, unique and distinctive facts and circumstances of the particular case and the specific defendant, *See United States v. Johnson*, 567

F.3d 40, 50 (2d Cir. 2009), *United States v. Preacelay,* 268 F.3d 72, 84 (2d Cir. 2010) (Lynch, J., concurring) (Guidelines are "only…a starting point" and court must "craft an appropriate sentence taking full account of 'the history and characteristics of the defendant' 18 U.S.C. §3553(a)(1)") and *United States v. Olhovsky,* 562 F. Ed. 530, 548, 552 (3d Cir. 2009), citing *Kimbrough,* 128 S. Ct. at 563; *see also United States v. Rodriquez,* 527 F.3d 221, 227-28 (1st Cir. 2008) (describing §3553(a) as a "tapestry of factors, through which runs the threat of an overarching…parsimony principle" that "instructs district courts to impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing." (internal quotation marks and citation omitted)).

Application of the §3553(a) factors and interpretive decisional law to the facts of Mr. Hessberg's presence before this Court demonstrate that imprisonment, while it is inevitable, is a virtual redundancy as Mr. Hessberg's self-inflicted harm has already cost him his reputation, his professional standing and stature, his employment, his employability, his position in the community and his role in his family, among his friends and in the public and private arenas where, until these events, he had spent his well-lived life. He does and always will live with the knowledge that he has shamed and disgraced himself but also the family name and embarrassed all those that bear that name. He will leave this Courtroom as a felon and a sentence that will burden and limit him for as long as he lives.

The goal of the 18 U.S.C. §3553(a) factors is to assure a fair proportionate balanced and just sentence for the specific individual considering the uniqueness of the life led to this point and the consequences of offense committed.

# HISTORY AND CHARACTERISTICS OF ALBERT HESSBERG, III

In addition to the history, biography and background information provided through the Probation Department Presentence Investigation and submissions provided with that investigation to the Court, Mr. Hessberg's societal contributions, public service, charitable works, commitment to his community, to his family, to his colleagues and to a broad range of organizations and his fundamental decency are best documented and summarized by the supporting letters written to the Court, in excess of 100, by people and on behalf of organizations from all walks of life and virtually every segment of our community. These letters have been or are being provided to the Court and have been previously provided to the Probation Department and need not be recapitulated, although some will be referenced.

As a parent, grandparent, as a citizen, a lawyer, friend and volunteer, his basic instinct throughout his life has been to serve and help others.

Clearly, the offense which brings Mr. Hessberg before the Court is not who he is and is completely inconsistent with every other aspect of his life, a life and career that has had profound and lasting benefit for the lives of so many others.

I have known Mr. Hessberg all of his professional life. I have served on boards with him and have worked with him to support and advance the work of many charitable organizations in this community. I have also represented hundreds of people at state and federal sentencings, but I can think of no other client or individual whose criminal conduct was so aberrant, so surprising, so removed from the life, work and the inherent goodness of character that has embodied Mr. Hessberg's existence.

In spite of the remarkable outpouring of support, love, respect, gratitude, bewilderment and tears evidenced by the letters, Mr. Hessberg's primary characteristic now is shame. He has, he

4

feels, burdened his broad family with his self-inflicted failure. He has disgraced the name "Hessberg", he believes, and all who bear that last name with the stigmatized association between that name and his crime.

I believe that it is clear that Mr. Hessberg has always been challenged by the remarkable legacy, professional and athletic, of his late father, aspiring to measure up to those accomplishments and at the same time driven to try to provide all of the benefits to his family that his family provided to him. In that relationship and in those aspirations grew the seeds for this crime. He could not do, once his father's firm was acquired by the larger firm, for his family what his father had done for him. He was driven to provide his children the same private education opportunities, the same social and community activities that he had had. He had graduated from college without debt and felt the responsibility to assure his family that same benefit. He could not carry the Hessberg name forward at the same level with the same community participation, commitment and expectations established for the Hessberg name by his parents without the resources his father enjoyed, so larceny became the remedy.

In an attempt to mitigate the loss to the affected clients, Mr. Hessberg has borrowed $1.7 million dollars and turned every penny of that over to his former firm, Barclay Damon. In talking with Mr. Hessberg it is clear that he always believed and always intended that he would be in a position to return the money and hold harmless the clients. It was delusional and perhaps self-justifying, but it was a belief that sustained him as he lived day-to-day with the burden of the consequences of his actions. The $1.7 million dollars paid back by Mr. Hessberg is being supplemented by an additional sum of $54,270 from a surety bond covering the Peebles estate.

Mr. Hessberg has also undertaken to have amended tax returns prepared for each of the involved tax years and those returns are in the process of being completed and filed. There is a

significant tax obligation established by the amended returns, but at the insistence of Mr. Hessberg, that tax obligation has been subordinated to his intense desire and first priority to return the money to his clients.

From the very inception of the firm's investigation and the ensuing government investigation, Mr. Hessberg has done all he could to cooperate. While he did not have any of the estate files at issue or have access to them, he and I met on a number of occasions at the law offices of Barclay Damon to review information, identify clients, review files and try to assist the law firm in its reconstruction of the respective estate's financials and the losses. This commitment to cooperation was to attempt to identify every dime that was taken by him.

At the law firm he would review files, documents, statements and anything else that was presented to him to help facilitate that undertaking. While working through shame, guilt and remorse, he never lost sight of that goal and never stinted in his efforts, as distasteful as they would be to anyone in his position, to borrow money, every dime of which, $1.7 million dollars, went to the law firm for the clients.

**THE PARSIMONY PRINCIPLE AND THE RELEVANT SECTION 3553(A) FACTORS SUPPORT STRONGLY A SUBSTANTIAL DOWNWARD VARIANCE**

While a sentence of imprisonment is inevitable, one weighted in favor of the guideline range would be draconian, vindictive and disproportionately punitive requiring complete disregard of the parsimony principle and the relevant Section 3553(A) factors. A sentence of imprisonment combined with a significant community service commitment to be completed upon supervised release would be sufficient, but not greater than necessary, to fully satisfy the purposes and principles of the sentencing concept. His cooperation, acceptance of responsibility, remorse, his borrowing of $1.7 million dollars and the payment of every penny of that to the law firm for the clients and the whole panoply of his exemplary life argue for a substantial downward

6

variance (See **U.S. v. Kim,** 364 F.3d 1235 (11th Cir.2004) (defendants conduct demonstrated sincere remorse and acceptance of responsibility by liquidating 75% of their life savings and voluntarily undertaking enormous debt in order to pay $280,000 restitution after pleading guilty to defrauding the U.S., and was extraordinary enough to remove case from the heartland and justify downward departure from 24 months to probation and home detention).

Furthermore, the law and principles of sentencing strongly argue for downward variances for individuals whose lives have been otherwise exemplary and certainly Mr. Hessberg has, but for this offense, led a life that is valued and appreciated by his broad community and a life that has beneficially impacted countless individuals and organizations within this community (See **U.S. v. Thurston,** 544 F.3d 22 (1Cir.2008) (after Gall, court affirmed district court's choice of 3 months rather than 60 month guideline term for Medicare fraud conspiracy of more than $5 million, citing, among other things, Thurston's charitable work, community service, generosity with his time, and the spiritual support and assistance he provided others).

In this context, a brief reference to excerpts from a few of the more than 100 letters written on Mr. Hessberg's behalf is instructive.

Ab's daughter, Abigail Johnson writes to the court: "My dad has worked tirelessly for the past 35 years trying to provide a life for his three children and wife that he believed we deserved. ...(Ab) is a good, kind and giving man; a man who rarely, if ever, does anything for himself. A man who I witnessed all of my life devoting his time and energy to giving back to his community. ...**It is evident that much of my dad's life has been lived for others in hopes that sharing his passions and spirit would help the lives of those around him.**"

Ab's son, Albert Hessberg, IV, compellingly describes the character of his father, and his influence on his son's life.

Ab's sister-in-law, Christina Clark, describes Ab's support after her husband was diagnosed with cancer, almost immediately coming to Arizona to help Doug and the family deal with the cancer and his treatment and, thereafter, providing support at that time and following Doug's death.

Ab's wife, Cynthia describes her husband as one who "has to this day" put others first before himself, a father totally immersed in his children's school, athletic and social activities and a person who has always been there for anyone and everyone.

Patrick M. Sheehy and Tammie Racine of the Regional Food Bank of Northeastern New York where Ab had been volunteering with the organization since 2018 speak to the value of his work there saying "Ab truly stands out above the rest. He consistently goes above and beyond anything we would ask of our volunteers."

Ab's older sister, Caroline Hessberg Taylor writes in part to the Court: "He has never owned a boat, a fancy car, a bottle of vintage champagne or a Brioni suit. Profligacy is the farthest thing from his way of life. …When my mother was stricken with Alzheimer's, he was there every day to help my Dad care for her. He set up a hospital bed in our family room, he changed her clothes, carried her to the bathroom, comforted her and made it possible for her to stay home until disease finally claimed her. …Ab bore the brunt of our beloved parents' painful deaths. …My brother lives for his family. Sending them to good schools and colleges and to give his daughters the weddings they had hoped for."

All of the family and extended family speak to a selfless individual who, without hesitation, gave all of himself to help, to support, to provide opportunity and to improve the lives he engaged with.

Prominent attorney, Harold N. Iselin who has known Ab for more than fifty years states "There has never been an instance when he has not been willing to help a friend or colleague in addressing challenges they might be facing."

While every person expressed shock and bewilderment, Tom Dolin, managing partner for Hiscock and Barclay and a longtime associate of Ab, likely identified one of the pressures that drove Mr. Hessberg to conduct that was so aberrational when Mr. Dolin observed that in spite of Ab's unquestionable moral and ethical standards, societal pressure confronted him with "community and family expectations that could not be met."

## CONCLUSION

18 U.S.C.§ 3661 makes it clear that "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." The centrality of this concept to the sentencing process has been highlighted by the Supreme Court: "In particular, we have emphasized that '[h]ighly relevant – if not essential – to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.' Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" *Pepper v. United States*, 562 U.S. \_\_\_\_, 131 S Ct 1229, 1240 (2011).

The life and character of Mr. Hessberg so sincerely and so consistently described in the letters before you, require a meaningful variance to a below guideline sentence of imprisonment coupled with a significant period of community service on release and the opportunity while on

9

supervised release to make further restitution and to also have the opportunity to address his tax liability.

Respectfully submitted,

By: _____
E. Stewart Jones, Jr., Esq.